## In re BONNEVILLE PACIFIC CORP., Debtor.

### Bankruptcy No. 91A–27701.

United States Bankruptcy Court,
D. Utah,
Central Division.

May 22, 1996.

Robert L. Stolebarger, Greggory J. Savage, Haley & Stolebarger, Salt Lake City, UT.

Richard A. Rappaport, Vernon L. Hopkinson, Cohne Rappaport & Segal, Salt Lake City, UT, for trustee.

Clark Waddoups, Robert B. Lochhead, Kimball Parr Waddoups Brown & Gee, Salt Lake City, UT.

David K. Watkiss, David B. Watkiss, Watkiss Dunning & Watkiss, Salt Lake City, UT.

## MEMORANDUM OPINION AND DECISION

JOHN H. ALLEN, Bankruptcy Judge.

The Court has before it Motions to Alter or Amend its December 2, 1992, Memorandum Opinion and Decision on the fee applications of Hansen, Jones & Leta and Snell & Wilmer. The Court has considered all the evidence and testimony, the entire record in this case and its related adversaries, has heard argument of counsel and being fully advised issues this Memorandum Opinion and Decision.

### HISTORY

In its earlier decision, the Court found that counsel for the debtor, David E. Leta[1], represented the interests of the principals of the debtor to the detriment of the estate and engaged in activities designed to "sabotage efforts to ascertain the truth concerning the financial picture of this debtor." The activities included filing and noticing for hearing a wholly inappropriate and misleading plan and disclosure statement. *In re Bonneville Pacific Corp.*, 147 B.R. 803, 805–07 (Bankr. D.Utah 1992). As a result of these findings, the Court denied all compensation sought in the applications before it and ordered disgorgement of all previously awarded fees.

---

1. During the time periods covered by the various fee applications, counsel for the debtor in possession, David E. Leta was first, a shareholder in the law firm of Hansen, Jones & Leta and later, a shareholder in the law firm of Snell & Wilmer.

Ever mindful of the far-reaching implications of its decision, the Court allowed movants the opportunity to prove that David E. Leta, attorney for the debtor, had indeed fulfilled his fiduciary responsibility to act in the best interest of this estate. The movants also requested the Court to vacate its decision and restore and award all compensation prayed for in the fee applications that were denied. The Court then spent ten days listening to the evidence presented pursuant to the motions.

## NATURE OF THE DEBTOR

It would be an understatement to label this debtor, with all its underpinnings, complex. Indeed, it began so shrouded in mystery and secrecy the Court was forced on several occasions to remark on the record, "all I know about this case is that I don't know anything" and thereafter embark on a "lonely quest" for the truth. Because what occurred is so shameful, it is important to tell the story as completely as possible. Let it serve as a reminder to all who might be tempted to shirk fiduciary responsibility, beware.

## INTRODUCTION

It took much time, effort and energy and this Court's sua sponte appointment of an examiner for the following information about the debtor and its business dealings to come to light. The result of all the effort reveals that the nature of the debtor was nothing more than a not-very-sophisticated variation of the classic "land flips" that brought the savings and loan industry to its knees.[2]

## BACKGROUND

Although the exact public posture of the debtor was not revealed until several months after filing, for the sake of clarity, it is appropriate to begin this narrative with a brief description.

Bonneville Pacific Corporation ("Bonneville"), a publicly owned company, filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on December 5, 1991. At that time, Bonneville was the managing member of an assortment of entities which were intricately tied together by a coterie of individuals. These individuals collectively dominated what ultimately became a multifarious and perplexing operation. The coterie began in 1977 when a Utah corporation known as the Bonneville Group was formed by Raymond L. Hixson ("Hixson"), L. Wynn Johnson ("Johnson"), Robert L. Wood ("Wood"), Carl T. Peterson ("Peterson"), John T. Dunlop ("Dunlop") and Deedee Corradini ("Corradini"), (collectively, "the principals").[3]

These principals then proceeded to put together the series of entities, the exact interrelationships between which are still not clear to this day.

On March 28, 1980, Hixson & Company, Inc., was incorporated in the State of Utah. On August 6, 1981, its name was changed to Bonneville Utah. Several modifications occurred in June and July 1986. First, Delaware Bonneville was incorporated in the State of Delaware; next, Bonneville Utah and Bonneville Delaware merged, Bonneville Delaware being the surviving corporation. Thereafter, Bonneville Delaware filed a Restated Certificate of Incorporation and changed its name to Bonneville Pacific Corporation ("Bonneville").

As described, Bonneville's operation was multi-faceted. Included in its operation was the buying, selling, development, and operation of small and medium sized energy projects. Between the years 1982 and 1985 Bonneville was involved in numerous hydro-

---

**2.** See Examiner's Report presentation in chambers, June 3, 1992, page 49, line 13 through page 56, line 15.

**3.** To date, one of the principals of the debtor, Dunlop, has pleaded guilty to three felony counts and served a period of time in a federal penitentiary. On June 1, 1995, others of the debtor's principals, Wood, Johnson, and Hixson were indicted by a federal grand jury on 59 counts, including securities fraud, conspiracy, bank fraud and mail fraud all relating to their insider involvement with Bonneville. On July 28, 1995, Peterson pleaded guilty to two criminal counts (including a felony count related to the Dinuba transaction) and was sentenced to a period of time in federal prison and a substantial fine. Peterson must also pay the debtor's estate a criminal restitution of $500,000.

electric plants. Such systems were known as "cogeneration" facilities. In theory, these alternative energy facilities generated electricity and made commercial use of the heat produced as a byproduct of generating the electricity.

The supposed energy projects included Magic Valley, Steamboat, American Atlas, Dinuba, TET/Recomp, BWETA, Pacific Hydro 11, Bonneville Nevada Corporation, Yuma Project, Island Park Project, Koyle Ranch Project, Recomp, Inc., Alpac/Ecocure, Tamarack Project, as well as others whose identities and exact relationships were never adequately explained.

In addition to the energy project entities, others were created for more specific purposes such as Bonneville Management to operate the facilities and Bonneville Fuels and Bonneville Foods to sell products.

On September 30, 1985, the principals incorporated a new entity in the Republic of Panama, called Sallah International, Inc. ("Sallah"). Sallah was intended to be an offshore version of Bonneville Group. Other offshore entities were formed including Lio Cam and L & D [4].

These offshore entities had no employees, transacted no business and had no corporate existence apart from their use as repositories of funds utilized in transactions effected by the principals. In other words, all of these created entities were front or straw companies.[5]

Until 1986, Bonneville was privately held. In 1986, it initiated a public offering of its stock. The public offering was based upon the grossly exaggerated and ever-increasing paper value of the non-existent assets contin-

ually transferred between Bonneville and its related entities.[6]

It is important to note that beginning in 1984, two years before Bonneville's initial public offering, legal services were provided to Bonneville and its related entities by Mayer, Brown & Platt. The principals worked closely with this law firm. Evidence suggests these lawyers and principals met to outline universal company policy, virtually ignoring technical lines that divided the specific entities.

The relationship between Bonneville and Mayer, Brown & Platt continued through April 1992, approximately five months after Bonneville filed its petition in bankruptcy.

## APPLICATIONS FOR EMPLOYMENT OF PROFESSIONALS

Concurrent with the filing of the bankruptcy petition, on December 5, 1991, Bonneville, operating as debtor in possession, filed an application to employ the law firm of Mayer, Brown & Platt as its general counsel, an application to employ Hansen, Jones & Leta as its local counsel and an application to employ Buccino & Associates, Inc. as its financial consultant.

### *Mayer, Brown & Platt*

Accompanying the application to employ Mayer, Brown & Platt as general counsel was an affidavit of disinterestedness filed by one of its partners, Lawrence K. Snider. That affidavit stated:

3. To the best of my knowledge and belief, MB & P has no direct or indirect relationship to, connection with or interest in the Debtor, any creditors, or any party in interest, their respective attorneys and

4. See Examiner's Report presentation in chambers, June 3, 1992, page 43, line 18 through page 49, line 12.

5. The entities discussed in this opinion do not begin to fully complete the picture of all of Bonneville's financial interrelationships with other entities similarly created. For example, in Exhibits D and E to the disclosure statement submitted on behalf of the debtor in possession by David E. Leta, he lists numerous related subsidiaries and partnership interests. As noted from the bench, this Court doubts that the full extent of Bonneville's involvement with all these

creations, including partnerships, will ever come to light.

6. An example of the inflated values of Bonneville's interests in these paper companies is Recomp. The insiders caused Bonneville to invest nearly $50 million in Recomp, $37 million of which was a direct cash payment in a period of just over two years. In the Fall of 1992, the trustee sold Bonneville's interest for approximately $700,000. John T. Dunlop was the President of Recomp, Inc.

accounts [sic], the United States Trustee, or any person employed in the office of the United States Trustee, except as stated herein.

4. MB & P is a partnership which employs over 500 attorneys, and some attorney may have represented or may continue to represent certain of the Debtor's creditors or other parties in interest herein, or interests adverse to such creditors or parties in interest herein, in matters unrelated to this Case.

5. MB & P has, for some time prior to the filing of this case, represented the Debtor in connection with various specific matters. Such prior representation does not disqualify MB & P from representing the Debtor in this case.

6. The Debtor has several subsidiaries which have a debtor-creditor relationship with the Debtor. Such subsidiaries also have requested that MB & P represent them in connection with certain of their financial affairs as a result of the filing of the Case. MB & P believes that no actual conflict nor appearance of impropriety exists in connection with MB & P's proposed dual representation of the Debtor and its subsidiaries. MB & P believes that at the present time differing interests are not present and that a unity of interests exists between the Debtor and its subsidiaries. In addition, the economic benefits to be gained by both the Debtor and its subsidiaries from such multiple representation, and attendant cost savings as a result of the economies of scale, would be significant and in the best interest of the Debtor and its subsidiaries. However, MB & P does not and will not represent any interest adverse to the Debtor or its estate during the pendency of this Case.

Based on the lack of disinterestedness and the conflicts of interest that were apparent on the face of the affidavit, and after notice and hearing, the Court denied the application. On December 24, 1991, Mayer, Brown & Platt appealed the order of denial. The United States District Court consolidated that appeal with several other pending appeals dealing with the same issue of law— denial of approval of employment of debtor in possession's choice of attorney on the basis of actual conflict of interest. On June 19, 1992, United States District Court Judge Dee Benson upheld the Bankruptcy Court's ruling stating:

Bonneville is a holding company which does not in most instances directly operate any businesses. Its businesses are operated through a complex corporate structure which delegates control and ownership of the operating facilities to more than 25 subsidiaries of Bonneville. Bonneville owns in whole or in part each of the subsidiaries, and exercises in some cases direct and in other cases indirect control over the subsidiaries.

Bonneville chose as its legal counsel Mayer, Brown & Platt ("MB & P") because of MB & P's extensive experience in bankruptcy law and Chapter 11 proceedings involving business entities. Bonneville chose Hansen Jones & Leta ("HJ & L") as its local counsel because of their expertise in the bankruptcy law and Chapter 11 Business reorganizations in the United States Bankruptcy Court for the District of Utah and its familiarity with the Local Rules of Practice in this District. Buccino & Associates ("Buccino") was chosen as Bonneville's financial consultants because of its considerable experience in dealing with and resolving business difficulties of troubled companies.

Each of the professionals have been asked by some of the subsidiaries who have a debtor/creditor relationship with Bonneville to represent them in connection with certain of their financial affairs as a result of the filing of Bonneville's bankruptcy case. Believing no conflict exists, the professionals agreed to the representation.

At the hearing regarding the professionals' applications the United States Trustee did not object to the applications. None of the creditors objected; two of the largest creditors of Bonneville—Chase Manhattan Bank and Portland General Holding, Inc.—supported approval of the applications. The United States Trustee only stated his concern that the applications may not satisfy the standards of the Bankruptcy Court's decision in *Green Street.*

The Bankruptcy Court denied the applications based on the law stated in *Green Street*. Because the bankruptcy court based its decision in the *Bonneville* case on *Green Street*, this court will consider both appeals together....

While the court appreciates that the bankruptcies involved in these cases are complicated, especially the Bonneville bankruptcy, the court holds that dual representation would present significant conflicts of interest. Accordingly, the *Bonneville* and *Green Street* appeals are AFFIRMED [7].

*In re Interwest Business Equipment, Inc.*, et al.,[8] Civ. No. 91–C–1062B (D.Utah, June 22, 1992).

The other debtors in possession appealed the District Court's decision. However, by then, the trustee had been appointed in Bonneville [9] and that trustee chose not to expend estate assets on the matter. Without Bonneville, the issue of the Court's responsibility to deny appointment of counsel who also represented interests that conflicted with the bankruptcy estate proceeded to the Tenth Circuit. In a stinging opinion, the Tenth Circuit affirmed this Court's and the District Court's refusal to approve appointment of counsel with interests that conflict with the estate. *In re Interwest, Inc.*, 23 F.3d 311 (10th Cir.1994).

In these appeals from three related Chapter 11 cases we are asked to second-guess the bankruptcy court's decision to deny approval of employment of each debtor in possession's choice of attorney on the basis of actual conflict of interest. *Id.* at 313. The reasons why counsel to a debtor in possession must meet the high standards of undivided loyalty established in § 327(a) are explained in *In re McKinney Ranch Assoc.*, 62 B.R. 249 (Bankr.C.D.Cal.1986).

> It is the duty of counsel for the debtor in possession to survey the landscape in search of property of the estate, defenses to claims, preferential transfers, fraudulent conveyances and other causes of action that may yield a recovery to the estate. The jaundiced eye and scowling mien that counsel for the debtor is required to cast upon everyone in sight will likely not fall upon the party with whom he has a potential conflict.... *Id.* at 254.

*Id.* at 316.

On December 12, 1991, pursuant to a second application to employ Mayer, Brown &

---

**7.** Exh. K is a letter from David E. Leta to Lawrence K. Snider dated July 14, 1992. The letter discusses Judge Benson's Memorandum Decision and Order of June 22, 1992, affirming the Court's order precluding Bonneville's professionals from simultaneously representing the debtor and Bonneville's affiliates. The letter states, in part "[I] ... find it to be uniquely unsatisfying in addressing the important questions raised by the appeal ... raises more questions than it answers and in particular, creates meaningless non-legislative distinctions between 'big companies' and 'small businesses' ... is so poorly reasoned that up until the final conclusion, I thought Judge Benson was laying a framework for reversing Judge Allen.... I would like to know whether Mayer, Brown & Platt intends to appeal the Decision to the Tenth Circuit and, if not, whether it would join in such an appeal if we initiated one...."

Exh. L is a letter from Lawrence K. Snider to David E. Leta dated July 15, 1992. It states "I was very surprised by Judge Benson's decision which I found to be totally without any thought or analysis ... After a considerable discussion here, we have concluded that our energies are best served in other matters. I have written to Mark Rinehart to secure his consent for a further appeal but I have received no response. Should you decide to appeal, because of the importance of the issue, we would certainly provide some assistance to you and might consider joining with you but at this time we will defer...."

Exh. M is a letter dated July 17, 1992, from Vernon L. Hopkinson, attorney for trustee, to David E. Leta. It states: "[T]he Trustee has concluded that an appeal of Judge Benson's decision would not be appropriate and therefore we will not be joining with you or supporting an appeal of that decision...."

David E. Leta did appeal Judge Benson's decision to the Tenth Circuit in order to preserve Bonneville's rights until it could give a definitive answer as to whether it wanted to proceed. Bonneville's appeal was subsequently dismissed. The other appellants persisted and, as noted below, were unsuccessful.

**8.** The debtors in possession involved in the consolidated appeals were *Interwest Business Equipment, Green Street, Retail Systems*, and *Bonneville*. This Court's decision was called *Green Street*, the District Court's and later the Circuit Court's opinion in the consolidated appeals are under the title *In re Interwest*.

**9.** As discussed below, an independent trustee, Roger Segal, was appointed, on June 12, 1992, to take control of this Chapter 11 estate.

Platt as special counsel, the Court did authorize, for very limited purposes, such employment.[10] Pursuant to its role as special counsel, Mayer, Brown & Platt filed three interim applications, totaling $300,603.59, for fees and costs. Prior to filing, the debtor had given Mayer, Brown & Platt a total of $177,157.62, presumably as a retainer pursuant to the contemplated bankruptcy proceedings.[11]

### Hansen, Jones & Leta

Hansen, Jones & Leta was first approached by Mayer, Brown & Platt on November 18, 1991. The reason for the selection of Hansen, Jones & Leta to serve as local counsel for Bonneville was that one of its partners, David E. Leta, had been recommended by a partner of Mayer, Brown & Platt. Hansen, Jones & Leta agreed to the representation. During this period of time, Hansen, Jones & Leta had fourteen attorneys, five specifically engaged in bankruptcy practice, but the attorney responsible for the local representation was to be David E. Leta.

After the Mayer, Brown & Platt application to serve as general counsel was denied by the Court, an application was made to employ Hansen, Jones & Leta as general bankruptcy counsel for Bonneville. Based on the fact that the application indicated further involvement of Mayer, Brown & Platt as general counsel, it was denied.

A second application and order, which deleted all reference to Mayer, Brown & Platt, was subsequently signed on December 12, 1991. Thereafter, it was supposed that Hansen, Jones & Leta would be engaged with Bonneville, devoting its full fidelity to the debtor. This supposition was based on the statutory requirement that the attorney so engaged be disinterested and free of conflicts required by the fiduciary position occupied by such an attorney in a bankruptcy proceeding. 11 U.S.C. § 327(a).

From this point forward, Hansen, Jones & Leta was to function as general counsel in the stead of Mayer, Brown & Platt since the Court had found that Mayer, Brown & Platt was unfit to occupy a fiduciary relationship with the debtor. In making such a finding, the Court emphasized its firmly held and continuing belief that on the launching of a case through the deep and hazardous waters of Chapter 11, when experienced counsel is requested to represent a corporation as a debtor in possession, counsel is expected to advise shareholders and insiders that there can be only representation of the corporation itself. Shareholders and insiders must obtain separate representation. No professional is entitled to be paid through a bankruptcy court where there exists an opportunity for divided loyalty. If such manifests itself, the professional will ultimately be a volunteer, for no money will be paid from the estate in such a situation. *In re Dasom, Inc.*, 27 B.C.D. 137, 180 B.R. 430 (Bankr.W.D.Pa. 1995).

### COURSE OF THE CASE

For a substantial period, there was no significant activity in the case except for general housekeeping matters such as applications to sell insignificant assets, some compromises, orders limiting notice, an application to employ Deloitte & Touche[12] as

---

**10.** On February 4, 1992, the Court authorized Mayer, Brown & Platt to act as special counsel for additional specific purposes. One was to allow it to defend the debtor and its estate against the Motion for Relief from Stay filed by American Atlas # 1, Ltd. Another was to assert appropriate causes of action on the part of the debtor against American Atlas # 1, Ltd.

**11.** In August, 1993, the trustee initiated suit against Mayer, Brown & Platt. In 1995, he also filed, in the Bankruptcy Court, a detailed objection to its fee application. Finally, he sought to have it disgorge at least $177,000 in funds that had been paid to it by the debtor on December 4, 1991, one day before filing. On May 3, 1996, the trustee filed with the Court a settlement agreement which requires Mayer, Brown & Platt to pay the trustee $30 million by June 30, 1996. Additionally, it shall pay up to an additional $3.5 million if certain conditions are met. Mayer, Brown & Platt will also release all claims to the $177,000 which is being held in the trustee's trust account. A hearing on Court approval of the settlement is set for May 24, 1996.

**12.** The trustee commenced an action against Deloitte & Touche and related entities asserting damages caused by these defendants as a result of participation in or failing to disclose sham transactions. On May 2, 1996, the Court approved a settlement with Deloitte & Touche in the amount of $65 million payable on or before June 1, 1996.

accountants for the debtor, application for appointment of counsel for the unsecured creditors' committee, stipulations terminating stay, notices of appearances, requests for continuances and so on.

Then, on January 14, 1992, a Motion for Relief From the Stay was filed by creditor American Atlas #1, Ltd. A notice of hearing for February 20, 1992, was filed January 24, 1992. After the motion was filed but before the hearing, other housekeeping filings occurred such as motions to pay certain prepetition employee benefit plan obligations, an application to employ Parsons, Behle & Latimer as special counsel for the debtor,[13] an application to employ appraisers, application by the creditors' committee to employ Ernst & Young as accountants, an ex parte motion to extend time to assume or reject nonresidential real property lease, motions to pay employee expenses, motions for authority to lend money to affiliates and related entities, motions for special procedures for interim fee applications, and motions for expanded responsibilities for Mayer, Brown & Platt and Parsons, Behle & Latimer.

### American Atlas #1 Ltd. Hearing

The American Atlas #1, Ltd. relief from stay hearing proved to be a very important watermark. It was during this hearing that the Court finally, for the first time, heard details, albeit limited, concerning the business operations of the debtor, the activities of its principals and its relationship to its subsidiaries. During closing argument, counsel for the movant stated "We believe these people are thieves, that they have done us wrong, and that they have put a valuable asset in jeopardy." Ultimately, the Court concluded that what had been argued to have been a valuable asset of the debtor was not an asset, was a liability, was not needed for an effective reorganization and involved some

very questionable transactions by principals of the debtors including evidence of prepetition mismanagement and wrongdoing.[14]

### Motion for Temporary Restraining Order and Preliminary Injunction

On February 26, 1992, hard on the heels of the American Atlas #1, Ltd. matter, in Adversary Proceeding No. 92PA–2057, *Bonneville Pacific Corporation v. Portland General Holdings, Inc.*, the debtor filed a Motion for Temporary Restraining Order and Preliminary Injunction. The motion stated:

> Pursuant to 11 U.S.C. § 105(a) and this Court's general equity powers, Plaintiff, Bonneville Pacific Corporation ("Bonneville"), moves this Court for an order temporarily staying and preliminarily enjoining prosecution of the action filed by Portland General Holdings, Inc. in the Third Judicial District Court of Salt Lake County, Utah entitled *Portland General Holdings, Inc. v. Deloitte & Touche, et al.*, Civil No. 920900386CV, as against the individual and "John Doe" defendants named therein, during the pendency of Bonneville's Chapter 11 case. This motion is supported by the memorandum of points and authorities filed herewith, the affidavit of Clark Mower and by plaintiff's Verified Complaint.

The individual defendants were principals of the debtor including Wood, Johnson, Dunlop and Gerald C. Monson ("Monson"). In the accompanying memorandum they were described thus:

> 2. On and prior to December 5, 1991, Wood was the Chief Executive Officer and President of Bonneville, a member of Bonneville's Board of Directors and Chairman of the Board of Directors. At the present time, Wood serves as a member of

---

13. The trustee brought an action alleging that Parsons, Behle & Latimer intimately participated in the ongoing fraud perpetuated by insiders of the debtor. Ultimately, a settlement between the trustee and Parsons, Behle & Latimer was approved by the Court on February 9, 1996, for $6.9 million.

14. In acquiring this asset, the principals paid $1,000. In a matter of days, they flipped it

several times through various entities which they controlled and they ultimately pocketed $4.5 million for their efforts. This ill-gotten increase was divided among Dunlop, Johnson, Hixson and Corradini. Simply put, the American Atlas #1, Ltd. project was structured through the commonly controlled entities, including Sallah, as a sham paper transaction.

Bonneville's Board of Directors and as Chairman of the Board.

3. At the present time, Johnson serves Bonneville as an active member of its Board of Directors and, from time to time, assists Bonneville's management on specific projects.

4. At the present time, Dunlop serves Bonneville as a Vice President and as an active member of its Board of Directors and also serves as an officer and director of Recomp, Inc., which is a major subsidiary of Bonneville.[15]

5. At the present time, Monson is employed by Bonneville as a Vice President in charge of accounting. . . .

10. At the present time, the Individual Defendants devote substantial time, energy and attention to operating Bonneville's business, developing a plan of reorganization for Bonneville, consummating transactions in anticipation of a plan of reorganization, and operating numerous key subsidiaries and projects which will form the foundation for a plan of reorganization. The continued uninterrupted service of the Individual Defendants to Bonneville is essential to the successful completion of Bonneville's reorganization.[16]

(Internal citations omitted).

On March 2, 1992, the debtor filed an Amended Motion for Preliminary Injunction asking that the requested injunction be "through and including August 31, 1992, or entry of a final, non-appealable order confirming a plan of reorganization proposed by Bonneville Pacific Corporation ("Bonneville") in its pending Chapter 11 case, whichever occurs first, in lieu of a preliminary injunc-

tion during the pendency of Bonneville's Chapter 11 case."

The motion was heard on March 5, 1992, and was denied by order signed April 1, 1992.

On March 23, 1992, the debtor filed a Motion for Order Extending Exclusive Periods. Citing the difficulty inherent in proposing a meaningful plan of reorganization while attempting to deal with contingent, unliquidated or disputed claims, the debtor, after a hearing based on shortened notice, held March 31, 1992, obtained an Order Extending Exclusive Periods For Filing Plan and Obtaining Acceptances, through and including July 17, 1992.

On April 3, 1992, a Notice of Substitution of Counsel, effective April 1, 1992, stated the debtor's intention to substitute the firm of Snell & Wilmer as its general bankruptcy counsel in place of Hansen, Jones & Leta. David E. Leta had changed firms. The Order granting the motion was signed May 4, 1992.

### Sua Sponte Appointment of Examiner

Several fee and cost applications had been noticed for April 6, 1992, including applications for Hansen, Jones & Leta, Buccino & Associates, the unsecured creditors' committee and Parsons, Behle & Latimer. The application for Mayer, Brown & Platt, originally noticed for this day, had been continued but not before several objections had been filed. After hearing arguments for and against the particular applications, the Court expressed some grave concerns.

The Court has reviewed each of the applications in great detail and has heard with

---

**15.** Trustee's Report filed July 22, 1993, indicated that although the debtor had invested more than $27 million in Recomp, including a $500,000 postpetition loan, the trustee, utilizing unrelenting efforts in disposing of what proved to a questionable asset, was only able to realize cash of $500,000 and a Promissory Note in the amount of $189,000.

**16.** The Trustee's Report filed July 22, 1993, stated that by the time the trustee was appointed, June 12, 1992, top level management had "literally headed for the hills (to their homes in the foothills surrounding the Salt Lake valley) and

were no longer involved in the management or operations of the debtor or its subsidiaries." "The Trustee has found that, with few exceptions, every project in which the debtor is involved is tainted in some manner by the business practices of the Debtor's prior management."

"The Debtor's interests in many of the projects are or were of little or no value as a result of over-leveraging of the projects . . . or the use of other methods by which the Debtor extracted cash from the projects in their early stages or by which the Debtor facilitated false earnings transactions."

great interest the arguments in opposition to the same and in defense of the same and I have compared the evidence and argument with other evidence that this Court has heard in prior proceedings in this particular case. And in comparing the two, I am shocked at the inconsistencies of the information the Court is getting today and in the past. The Court has heard in prior hearings information from the representatives of Buccino & Associates that the matter was proceeding smoothly, the plan would be prepared by first, April 15th, and now, by May 18th. Today, counsel for Buccino describes in argument that the debtor is in chaos and has been in chaos, was at the time that Buccino took over, that it was a company adrift, that there was no one in charge, that the company was hemorrhaging and that Buccino & Associates had to train management and handle the day-to-day management and affairs of the company. . . .

While the fee application of Mayer, Brown & Platt is not being considered today for approval and has been continued, the Court has reviewed it and I discern from a review of that fee application that Mayer, Brown & Platt is advising the debtor in more areas than the appointment allows. I recognize that the initial applications of Mayer, Brown & Platt for approval as general counsel is now on appeal, but they are not now general counsel. . . .

At the American Atlas hearing on a motion for relief from the stay, this Court heard evidence of unexplained disposition of somewhere between 5 and $13 million. The debtor's own financial officer who testified on that day didn't know the details of that. These circumstances, together with the information that the Court received today, suggests that the Court knows one thing, that it doesn't know who's in control of this debtor. I'm not in the least way being critical of counsel for the debtor in this case because I wonder if general counsel for the debtor is being fully informed by the debtor and being asked to advise concerning all relevant matters.

The exclusive time to file a plan of reorganization has been enlarged at the request of the debtor. Everything seems to be on hold for some unexplained reason. There was an indication on the record last week that there would be a change of counsel or an addition to general counsel and a change of special counsel with no explanation and no information having been submitted to the Court subsequent. This information has so shocked me and so impressed me that it is obvious that the Court needs some independent information concerning this debtor and who is in control. I am, therefore, ordering an immediate appointment of an examiner pursuant to the authority of Section 105(a) to be effective immediately.

Thereafter, the Court requested answers to specific queries:

1. Who are the officers of the debtor?

2. What role Buccino & Associates played within the management of the company?

3. A determination of the assets and liabilities of the debtor.

4. Who is currently managing, advising and controlling the debtor?

5. Improprieties concerning Recomp.

6. Investigate all transfers in excess of $100,000 within the last three years.

7. An analysis of the subsidiaries of the debtor and all relationships thereto.

   a. Report on transfers between the debtor and the subsidiaries.

   b. Information concerning transfers between subsidiaries.

   c. Information concerning management and control of the subsidiaries by the debtor.

   d. The debtor's interest in various partnerships.

   e. Identify transfers of debtor assets to partnerships.

8. Identify who has been counsel for the debtor and the subsidiaries in the past three years.

   a. What funds have been paid to attorneys for the debtor?

   b. What funds paid to counsel for subsidiaries by the debtor?

   c. Has debtor's counsel been paid by the subsidiaries?

9. The annual income of the debtor's officers and directors for the past three years.

10. The source of debtor's income.

11. Identify all commitments that the debtor has to its subsidiaries and partnerships.

12. Disclose any evidence of fraud or mismanagement within the company.

13. Identify preferential transfers.

14. Identify any improper post-petition transfers.

It is a tragedy that counsel for Bonneville, David E. Leta, and the counsel for the official unsecured creditors' committee, Ralph R. Mabey, had not, by this point, begun to conduct a proper investigation with an eye to bringing the true facts before the Court. According to the evidence, they had been exposed to certain indications, such as the Buccino Report and the Portland General Complaint, that would serve to put any professional, serving in their capacity, on extra alert. David E. Leta testified that he was not in a position to know that the information in the plan and disclosure statement was misleading. However, if this Court, with no inside information, suspected enough to sua sponte appoint first an examiner and then an independent trustee, it is inconceivable these sophisticated attorneys, with all the information at their fingertips, could remain completely oblivious to reality.

The order appointing Alan V. Funk, as examiner, was signed on April 9, 1992, and specifically directed that the duties of the examiner included each area of concern identified by the Court in its ruling on April 6, 1992.

After the appointment of the examiner, but before his report, there was continued, tumultuous activity in the case including motions to assume real property leases, to pay certain employee expense obligations, to reject executory contracts, authority to enter into postpetition leases, approve stipulations, monthly financial reports, fee applications, an application to employ Ray, Quinney & Nebeker as new counsel for the debtor, motions to sell property, an application for order expanding the scope of Parsons Behle &

Latimer's employment as special counsel, and, on May 18, 1992, a Disclosure Statement and Plan of Reorganization was filed by the debtor.

### Joint Motion of Debtor and Official Unsecured Creditors' Committee for Order Extending Exclusive Periods

On May 14, 1992, the Court heard the Joint Motion of Debtor and Official Unsecured Creditors' Committee for Order Extending Exclusive Periods. The Joint Motion detailed the appointment of the examiner on April 6, 1992, and the examiner's report which was to be filed with the Court "on or about May 27, 1992." On April 14, 1992, the Court had entered the first order extending the exclusive periods for filing a plan of reorganization and obtaining acceptances of a plan of reorganization to May 18, 1992, and July 17, 1992. This Joint Motion asked for a time extension of 23 days each, up to and including June 10, 1992, and August 10, 1992.

The Joint Motion indicated the debtor had asked for the committee's consideration and advice on many issues "raised in a reorganization of the Debtor, including alternative plan structures and classification and treatment of various priorities of debt". It went on to say, "Notwithstanding that certain of the Debtor's past transactions are under investigation by the Examiner, the Committee understands the Examiner's preliminary investigation has found no wrongdoing on the part of current management—and specifically Mr. Clark Mower, the Debtor's President—in connection with any of the transactions which are the focus of the examiner's investigation. Affidavit of Alan V. Funk, filed herewith, at §§ 6 and 7 (hereinafter, "Funk Affidavit")." In addition to the affidavit of Alan V. Funk, examiner, there was an affidavit of Irving J. Thau, partner of Ernst & Young; the declaration of L. LeGrand Price, the chairman of the official unsecured creditors' committee; and Clark M. Mower, the president of the debtor. The pleadings and affidavits addressed two themes:

(1) What an outstanding job Clark M. Mower is doing running the debtor—he is forth-

coming, cooperative, very much in control, he has instituted an independent examination of business activities of RECOMP, Inc., and (2) Given the appropriate extension of time, the debtor, the official unsecured creditors' committee and the examiner, under the control and guidance of Mr. Mower, (helped by financial consultants on all sides) could put together a disclosure statement and plan of reorganization that would meet everyone's needs—no problem. According to the argument and testimony, the future for the debtor looked bleak without this extension. After hearing all the evidence and listening to the argument, the Court took a brief recess, then returned to rule:

> Notwithstanding no objections this is still a difficult decision. The evidence today is basically the same evidence that the Court received at the time of the last request for an extension of the exclusive period. The record before the Court shows there are enough professionals involved in working on the plan, or a least there should be, to have had that plan filed within the time that the Court has already authorized. My impression [was] that Buccino & Associates was developing the plan. And I hear today that Ernst & Young is also working on the development of the plan.

> I hear today, also, that Mr. Cattau was president of this company for a day, and that Buccino & Company ran the company for a month and a half.

> I hear today that Mr. Mower welcomes the examiner because the examiner will find assets. If assets are to be located it would seem to me that there have been sufficient professionals on board and they are abundant that should have located assets.

> The bottom line is the Court will welcome a plan from anyone who files a plan. I don't think the Debtor is entitled to an extension of the exclusive period. I don't think that there is a risk of competing plans, or if there is a competing plan filed, that isn't risk to creditors.

> There is no forcing the Debtor to file a plan on Monday. A plan that is incomplete and unconfirmable. If such a plan is filed just to protect the period, and it isn't a good faith plan, I'd have concerns about that. So, I deny the motion to extend the exclusive period.

Four days later, on May 18, 1992, the debtor filed a plan and disclosure statement.

The order pursuant to the motion for extension of exclusive periods was signed May 21, 1992.

It is helpful to scan the events in chronological order.

- March 2, 1992—debtor filed amended motion for preliminary injunction, insiders expertise needed for reorganization purposes.
- March 5, 1992—hearing on motion for preliminary injunction—motion denied.
- March 23, 1992—debtor files motion for extending exclusive periods.
- April 6, 1992—Court orders appointment of examiner, sua sponte.
- May 7, 1992—Supplemental Disclosure filed by LeBoeuf—had information from examiner.
- May 11, 1992—Joint motion for extension of exclusive periods filed—Joint Motion supported by affidavit from examiner.
- May 14, 1992—hearing on joint motion for second extension of exclusive period—motion denied.
- May 18, 1992—debtor files plan and disclosure statement—very general—mostly boilerplate.
- May 28, 1992—Examiner's Report filed under seal.
- June 1, 1992—notice of hearing on adequacy of disclosure statement, June 17.
- June 3, 1992—examiner presents report to Court—Court unseals report.
- June 10, 1992—application to withdraw as counsel filed by LeBoeuf, Lamb, Leiby & MacRae.
- June 10, 1992—Court signs order allowing withdrawal of counsel—effective June 17, 1992.
- June 11, 1992—Court sua sponte orders appointment of trustee.

♦ June 15, 1992—Creditors' committee files very general objections to debtor's disclosure statement.

This bewildering chain of events would be inexplicable unless it is viewed in the context of the debtor's attorney, David E. Leta, working in conjunction with the attorney for the official unsecured creditors' committee, Ralph R. Mabey, to protect insiders to the detriment of the estate. The filing of the plan and disclosure statement, four days after spurious pleas for more time, was grasping at straws in a vain attempt to continue the obfuscation. The plan and disclosure statement are incomprehensible if one attempts to ascertain the true operation of the debtor, the true value of the debtor's estate or its plan and method of reorganization. The objection is a soft lob that reveals nothing about the factual deficiencies of the documents. Yet, on May 14, 1992, it was argued to the Court, during the hearing on the Joint Motion for extension of exclusive periods, that within 23 days a confirmable, consensual plan and disclosure statement could be filed by the movants.

What subsequently occurred is that by June 11, 1992, the Court had read the Examiner's Report and, had been so alarmed by its contents, was forced to sua sponte appoint a trustee. But there was more, as explained in greater detail below,[17] between the time of the examiner's appointment and the Examiner's Report *in camera*. The Court had been signing documents which protected the integrity of the examiner's work product. It had believed the examiner was laboring on behalf of the Court and would report, in timely fashion, directly to the Court. Instead, the examiner seems to have expended time and effort on behalf of David E. Leta, counsel for debtor, and Ralph R. Mabey, counsel for the

official unsecured creditors' committee, providing them with services and expertise, i.e., affidavits, information and solutions. The Court was forced to conclude that the examiner's recommendation had been compromised as it pertained to the need for the appointment of a trustee.

### *Withdrawal of Counsel For Official Unsecured Creditors' Committee*

On May 7, 1992, filed with the Court was a "Supplemental Disclosure of LeBoeuf, Lamb, Leiby & MacRae in accordance with Bankruptcy Code Section 1103 and Bankruptcy Rule 2014 in Connection with Application of the Official Unsecured Creditors' Committee for Authority to Retain LeBoeuf, Lamb, Leiby & MacRae as Counsel."

The Supplemental Disclosure detailed a mutual relationship between LeBoeuf, Lamb, Leiby & MacRae and the debtor. It revealed that Yan M. Ross, married to Deedee Corradini, served as "Of Counsel" to LeBoeuf, Lamb, Leiby & MacRae and held 10,953 shares of stock of the debtor. In addition, Corradini was a 25% owner of L & D Enterprise Limited, Isle of Man Corporation,[18] and was involved, in a minor role, with Hallas, Inc. or Sallah International, Inc. which may have had certain, unspecified transactions with the debtor. The Supplemental Disclosure also indicated that Corradini resigned from her positions with Bonneville Associates which did business with, but was separate from, Bonneville.

According to the Supplemental Disclosure, LeBoeuf, Lamb, Leiby & MacRae had been informed, by the examiner, of the connections.[19]

17. See footnote 19.

18. Harris Report dated April 10, 1992.

19. The Supplemental Disclosure, filed with the Court on May 7, 1992, stated:
  2. Representatives of the Debtor and the Examiner recently informed LeBoeuf that it appears that the Debtor in the past has entered into business transactions with Sallah International, Inc. and with related entities which were owned in part by Hallas, Inc. The Examiner and representatives of the Debtor further

informed LeBoeuf that Ms. Corradini may have had an ownership interest in Sallah International, Inc. or Hallas, Inc.
  3. After receiving this information, LeBoeuf requested the Examiner's assistance in determining as promptly as possible whether and in what form supplemental disclosure was appropriate. The Examiner has cooperated by interviewing Ms. Corradini and Mr. Ross and by reviewing relevant matters. LeBoeuf believes that the following disclosure is accurate and consistent with the Examiner's present knowledge and information.

After receiving the information, LeBoeuf, Lamb, Leiby & MacRae requested the examiner's assistance in determining in what form disclosure of the newly found facts should occur. The examiner cooperated by interviewing Corradini and Ross and reassuring counsel that the involvement was of little concern. In the past, Corradini and Ross had borrowed funds from Sallah International, Inc. and paid interest on such loans. After Corradini's election as Mayor of Salt Lake City, the loans had been transferred to a corporation owned by the couple.[20]

LeBoeuf, Lamb, Leiby & MacRae promised a wall of confidentiality would surround all materials involved with the case and Ross would have no access to such. Thereafter, the Supplemental Disclosure was noticed for hearing on June 16, 1992.

Before the hearing could take place, the examiner's oral report was given *in camera* to the Court and the transcript of that oral report, as well as the written report itself,

> The Court had ruled, by order signed May 5, 1992, that the debtor, creditors or other parties in interest shall not have the right to appear in person or by counsel at examinations conducted by the examiner. When the Examiner's Report was filed with the Court on May 28, 1992, all volumes were filed under seal. An order was signed on June 2, 1992, providing that all volumes as well as appendix volumes to be so filed. On June 2, 1992, the Court rejected a motion brought by the United States Trustee for an order permitting attendance at the examiner's presentation and for delivery of the Examiner's Report. "The Examiner's Report is to be to the Court only." After the examiner's presentation, *in camera* to the Court, an order was signed on June 3, 1992, unsealing all sealed volumes and making available transcripts of the oral presentation to the Court, which also took place on June 3, 1992, available to the public.
>
> The relevant dates are thus: April 6, 1992, Court orders from the bench the immediate appointment of an examiner; April 8, 1992, notice of approval by the Court of the appointment of Alan V. Funk as the examiner; April 9, 1992, Court signs Order for the Appointment of Examiner; May 5, 1992, Court bars everyone but the examiner and his counsel from attending any examinations by the examiner; May 7, 1992, Supplemental Disclosure filed with the court outlining knowledge obtained by counsel for official unsecured committee and the debtor from the examiner; May 28, 1992, Examiner's Report filed under seal; June 2, 1992, Court refuses to allow attendance by any other entities at the oral presentation except the Court. The query is,

had been unsealed and made available to all interested parties.

On June 10, 1992, filed with the Court and signed by lead counsel, Ralph R. Mabey, was the Application of LeBoeuf, Lamb, Leiby & MacRae to Withdraw as Counsel for the Official Unsecured Creditors' Committee Pursuant to Bankr.D.Ut.Rule 542(a)(1), Motion to Strike a Hearing Scheduled for June 16, 1992, on the Supplemental Disclosure of LeBoeuf, Lamb, Leiby & MacRae in Accordance with Bankruptcy Code Section 1103 and Bankruptcy Rule 2014 in Connection with Application of the Official Unsecured Creditors' Committee for Authority to Retain LeBoeuf, Lamb, Leiby & MacRae, and Motion to Continue without Date the Hearing Scheduled for June 16, 1992, on the Second Application by LeBoeuf, Lamb, Leiby & MacRae for Interim Compensation and Reimbursement of Fees and Expenses.

The Application to Withdraw states:

> how and why did LeBoeuf, Lamb, Leiby and MacRae and the debtor receive the information concerning Corradini and why did the examiner conduct special examinations at their behest and impart to them his findings?
>
> In the Court's view, the breach of the duty of confidence on the part of the examiner has never been fully explained. The Court further believes this unexplained interaction between Ralph R. Mabey and the examiner compromised the examiner's opinion regarding the appointment of a trustee. Having stated, elsewhere, that management was doing a good job, the examiner could not have been expected to then do a complete turnaround shortly thereafter. However, the exhaustive array of alarmingly fraudulent facts and figures contained in the report proved to be an adequate basis for the Court's ultimate appointment of the trustee.

**20.** The corporation created by Corradini and Ross was Rossadini which became a vehicle for the collection of funds. From the Examiner's Report Dated May 28, 1992, page 93. "It is, however, clear from the Examiner's investigation that one of the purposes of transactions involving Bonneville Pacific and the off-shore companies was to provide an economic benefit to Ms. Corradini rather than simply those principals of Bonneville Group directly involved with Bonneville Pacific which would have excluded Ms. Corradini." As mentioned above, the trustee settled with Corradini and Ross early in the beginning of the massive litigation, for $860,000. This Court approved the settlement by Order signed September 16, 1993.

3. On May 28, 1992, the Examiner filed with the court his preliminary report which includes several statements concerning connections with Deedee Corradini, the spouse of Yan M. Ross an attorney who is of counsel at LeBoeuf, with entities that may be related to the debtor.

4. In light of the Examiner's report, Le-Boeuf has decided that it cannot continue to effectively represent the committee. This decision is not based on that fact that LeBoeuf is not a "disinterested person" within the meaning of section 101(34) of the Bankruptcy Code or that it has an interest adverse to the estate. Rather, under the "appearance of impropriety" standard set forth in *In re Roberts,* 75 B.R. 402, 405 (D.Utah 1987), LeBoeuf believes it should withdraw....

8. In addition, LeBoeuf moves to continue the hearing on its Fee Application without date because it desires additional time to prepare.

On June 10, 1992, the Court signed an order granting the Application to Withdraw, effective no later than June 17, 1992, at 5:00 P.M. or the date of the committee's retention, with court approval, of substitute counsel. The Motion to Strike and the Motion to Continue were also granted. To this date, no hearings have been noticed pursuant to those motions.

The puzzling aspect of the surprise, indicated by the Motion to Withdraw and the naivete of the Supplemental Declaration, is the evidence presented to the Court during the ten-day hearing on these motions to alter or amend. *See In re Joseph A. Calabrese,* 173 B.R. 61 (Bank.D.Conn.1994).

The Order Granting Application of The Official Unsecured Creditors' Committee, To Employ LeBoeuf, Lamb, Leiby & MacRae was signed January 6, 1992, designated effective as of January 3, 1992.

During the employment period, Ralph Mabey and LeBoeuf, Lamb, Leiby & MacRae billed the estate $208,696.21 for services performed and costs incurred.

Ralph R. Mabey and others of LeBoeuf, Lamb, Leiby & MacRae were in close and intimate contact with the officers and directors of Bonneville Pacific and at times, according to the testimony, seemed to be "running the show". They vigorously participated in and supported many of the efforts to protect the insiders that had the potential to inflict real harm on the estate. These included some of the very activities which so alarmed the Court that ultimately an examiner and a trustee were appointed. These included, at the request of the debtor, signing a confidentiality agreement and requiring a confidentiality agreement from all members of the official unsecured creditors' committee—ignoring the fact that counsel's client was the official unsecured creditors' committee. It is incumbent on counsel to never forget who the client is, and it is not the debtor and/or its principals, officers or directors.

The March 5, 1992, injunction hearing clearly had the active support of the committee. The support for injunctive relief occurred even though testimony and evidence suggests that Ralph R. Mabey and LeBoeuf, Lamb, Leiby & MacRae should certainly have been put on investigative alert from the information presented on January 28, 1992, when several members of the firm attended the Buccino Report meeting. Buccino reported values of the estate as having fallen by $200 million, almost 80% loss. Later, Ralph R. Mabey was given the information generated by the efforts of Dale Harris ("the Harris Report").[21]

Subsequently, Ralph R. Mabey met *in camera* with the Court, an unusual Saturday morning meeting, where he took the lead in presenting to the Court the "just discovered" defalcation of Dunlop. He was involved in the Magic Valley Settlement which paid not only $70,000 to various limited partners who were Mayer, Brown & Platt insiders but also protected them as well—at the same time allowing Mayer, Brown & Platt attorneys to be paid fees from the estate even though the services performed were to shield their own. This was affirmative and direct participation by counsel for the official unsecured creditors' committee. A member of LeBoeuf,

---

21. See Harris Report below.

Lamb, Leiby & MacRae participated in the American Atlas # 1, Ltd. hearing. So much evidence has emerged concerning the individuals involved in those endeavors, the Court is convinced that Ralph R. Mabey and David E. Leta walked in tandem down the ugly road of cover up and deceit, completely ignoring their statutory duties to protect creditors even at the expense of principals and insiders.

There is no question that the fees of the counsel for the official unsecured creditors' committee are not before the Court in these motions, nor were they part and parcel of the original opinion, nor is the Court in any way ruling on them today. However, the activities of Ralph R. Mabey and LeBoeuf, Lamb, Leiby & MacRae were fully documented by the evidence that was presented during this ten-day hearing. What has emerged illustrates the dangerous snowball effect of dereliction of duty.[22]

### Appointment of the Trustee

On June 11, 1992, during the hearing on the fee application for Buccino & Associates, continued from April 6, 1992, the Court made the following oral ruling:

Everyone knows that an examiner's report has been filed with this Court. The Court has read it. And that examiner's report, as well as what the Court has observed since the filing of this case, has left the Court with no confidence in the debtor and its ability to accurately report facts to the Court or reorganize solely with the efforts of the debtor. . . .

Right now at least two of the officers and employees of the debtor, as pointed out in the examiner's report, Mr. Rinehart and Mr. Monson, are influenced by Mr. Wood, former president and CEO. This

appears to me to have an influence on the debtor, on what the debtor does or does not do. And in my judgment, as I recited before results in counsel for the debtor getting less than complete information. Trustee could act independent of the outside influence, and, if necessary, terminate the services of those in the company who are not loyal to the present operation.

Right now, with the exception of counsel for the debtor, all counsel have apparent conflicts. Counsel for the creditors committee has the problem giving rise to—I assume giving rise to its withdrawal [sic] the matter of the Corradini matter. Mayer, Brown & Platt has had a conflict from the beginning in that as reflected in the examiner's report it took payment of substantial fees the day before filing, December 4, 1991, which is an obvious preference, and has represented subsidiaries all along and has failed to disclose those facts.

Parsons, Behle & Latimer, who's special counsel, failed to disclose and hasn't yet disclosed that it received an agreed reduced payment on its fees the day before filing, an obvious preference. Its fee application shows conferences with Mr. Wood, who the Court was of the opinion from evidence wasn't involved in any way, also with a Mr. Saperstein, who's not been approved as counsel. Neither counsel nor present management of the debtor, nor the creditors committee, can be expected to take any action to investigate and pursue, if appropriate, actions against former officers and directors who took advantage of corporate opportunities, or who took high signing and termination bonuses, or who made profits through inflated sales to the corporation. These people include Wood, Johnson, Nadauld, Hixson, Dunlop, Corra-

22. The official unsecured creditors' committee employed Ernst & Young as their accountants and financial advisors, approved by the Court, January 27, 1992. Partner, Irving Thau, was the liaison. From the date of its appointment through the date of its final entry on its final fee application, August 31, 1992, it billed the debtor, via four fee applications, a total of $316,987 for fees and costs. It continued to work for the official unsecured creditors' committee after the appointment, on June 12, 1992, of the trustee. In the meantime, the Court had declined to appoint new counsel for the committee (after the

withdrawal of LeBoeuf, Lamb, Leiby & MacRae on June 17, 1992.) The Court refused to appoint new counsel for the committee based on its belief that after the trustee was appointed he was statutorily bound to perform the duties formerly assigned to the committee and from that point forward, the committee had no official function. It continues to amaze the Court that the massive fraud and cover-up, first outlined in the Portland General Report, alluded to in the Buccino Report and supported by the facts and figures contained in the Harris Report, completely escaped the notice of accountants and financial advisors.

dini and others.[23] Neither present management nor the creditors committee can be expected to investigate, and; if appropriate, pursue the attorneys who received preferential or post-petition payment, since management is responsible for those payments.

It appears that management, including present management, have taken the attitude that it is business as usual without regard to the limitations of being in Chapter 11.

[D]uring [the] May 14, 1992, hearing on the motion to extend the exclusive period, Mr. Mabey argued, Mr. Leta concurred, that a complete plan was not yet ready, that if the Court denied the motion, a plan would be filed, even though it would not be a confirmable plan and would have to be modified. His exact words were that they don't want to file a plan which is unacceptable. The Court told those present that if a complete and confirmable plan could not be filed, there should be no plan filed just to meet the deadline, that the Court may consider such a filing a bad faith plan, if that's why it was filed. That's just what happened. The plan and disclosure statement that were filed are incomplete and will have to be modified in major proportions, especially in light of the examiner's report. In light of that report, the plan is woefully inadequate.

This raises the question again in the mind of the Court whether the debtor's counsel could ever get from the debtor's principals enough information to present a confirmable plan.

The appeal by Mayer, Brown & Platt from the order denying their approval as general bankruptcy counsel is still pending. Should that order be reversed, Mayer, Brown & Platt may be general bankruptcy counsel, even though some representatives of the debtors have said no. Appointment of a trustee would resolve that problem.

As evidence of the fact that present management does not know all of the assets, liabilities and circumstances of the case, is the testimony of Mr. Mower on May 14, 1992, that the examiner's report would be helpful in uncovering claims as assets. That made it clear that neither he nor any person in present management have done any work to uncover potential claims, such as preferences or fraudulent conveyances as assets.

The same day, May 14th, Mr. Mower testified that Mr. Wood had not been involved in the company operations since January 15, 1992. That was contrary to the testimony we received today. Yet the examiner's report indicates that Mr. Wood still has an influence on Mr. Rinehart and Mr. Monson, would suggest he still gives and gets information. This is evidenced by the examiner's report which reports that Mr. Rinehart, contrary to his assurances concerning a confidential memo of all the parties, gave a copy of that confidential memo to Mr. Wood and let him carry it off.... Under the circumstances, I believe, and it's my order, that a trustee should be appointed forthwith.

On June 12, 1992, Roger Segal was appointed the Chapter 11 trustee for the debtor, thereby removing Bonneville as debtor in possession.

## APPLICABLE LAW

### Standard on Motion to Alter or Amend

Pursuant to Fed.R.Civ.P. 59(e), movants seek to have this Court vacate its earlier decision and award all fees sought to date. Rule 59(e) provides no standard for when a district court may grant alteration or amendment of its earlier judgment. However, courts have recognized three grounds for amending an earlier judgment: (1) to correct an intervening change of controlling law; (2) the availability of new evidence; (3) the need to correct a clear error of fact or law; or (4) to prevent manifest injustice. *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C.Cir.1996).

The Tenth Circuit appears to follow a more restrictive interpretation of Rule 59(e).

---

**23.** Settlements have occurred with the trustee as follows: Wood, $915,000; Johnson, $1.65 million; Nadauld, $260,000; Corradini and Ross, $860,000.

"The purpose of such a motion is to correct manifest errors of law or to present newly discovered evidence." *Committee for the First Amendment v. Campbell,* 962 F.2d 1517, 1524 (10th Cir.1992) (proffered evidence did not warrant reconsideration because it had not been discovered subsequent to the order granting summary judgment).

### Debtor in Possession's Attorney as Fiduciary

■■■ Chapter 11 is a remedy for a debtor with considerable debts who does not wish to surrender all non-exempt assets to creditors and abandon all efforts to handle debt problems. The concept of a debtor doing its best to work out problems is termed rehabilitation and has been regarded favorably by the courts and Congress. The automatic stay of 11 U.S.C. § 362 gives the debtor a breathing spell free from hostile litigation in order to reorganize utilizing such methods as selling assets, borrowing money or changing methods of operation. The Court protects debtors within limits. The design of Chapter 11, to provide the debtor with some respite in order to regroup, is intended in general to be effectuated by the automatic restraint. But it was never intended to be used as a vehicle for debtors to deplete collateral in hopeless efforts to reorganize or to buy time for those who have used the corporation as vehicle for fraudulent conduct.

The function of Chapter 11 should be to segregate out the hopeless and pointless cases from the ones with some prospect. The court cannot be too much moved by an unrealistic debtor unable or unwilling to face facts and even less so by a fraudulent one. Courts have the independent duty to see that no one makes a mockery of the bankruptcy system by misusing it. One of the most important duties is to oversee professionals involved in a bankruptcy case.

Examination of the surrounding Bankruptcy Code section on professionals shows a consistent statutory scheme to give the bankruptcy judge discretion and power to ensure professionals are disinterested and do not represent interests adverse to the estate regardless of objection by party in interest. *See* 11 U.S.C.A. § 328(c) (bank-

ruptcy judge has discretion to deny compensation to professionals if at any time during employment 'such professional ... represents or holds an interest adverse to the estate'); 11 U.S.C.A. § 329 (bankruptcy judge may cancel fee agreements or recoup payments made to attorneys in the year prior to the petition filing, to the extent payments exceed the reasonable value of services). Thus, §§ 327(a), 328 and 329 are alike as they give the bankruptcy judge the responsibility and power to oversee professionals involved in a bankruptcy case without any requirement that the issues be raised by party in interest.

*In re Interwest,* 23 F.3d at 317.

■■■ Under Federal Rules of Bankruptcy Procedure 9011, all pleadings and motions filed for a party represented by an attorney must be signed by that attorney. An attorney who signs a pleading, motion or application certifies that he or she has read the paper and to the best of his or her knowledge, information and belief (formed after reasonable inquiry) there exists sufficient basis to support such a filing, that it is not filed for delay or any other improper purpose. Disciplinary action is to be imposed for a willful violation.

■■■ Because of the unique nature of a bankruptcy estate and the concept that the debtor in possession is a fiduciary for that estate, courts have imposed a fiduciary duty upon counsel for a debtor. *In re Wilde Horse Enterprises,* 136 B.R. 830, 840 (Bankr. C.D.Cal.1991). When representing the debtor in possession, its attorney has a duty to look to the interests of the estate and not to the interests of its principals, shareholders, officers or directors. This purpose can only be realized when all who labor within the confines of the Bankruptcy Code would never countenance fraudulent behavior and greedy gain, all attempts to delay and deny, all motives dictated by hidden agenda.

■■■ Under 11 U.S.C. § 541 of the Bankruptcy Code, each estate is a separate and distinct entity. In these Chapter 11 cases, the debtors in possession act as "trustees" of the estates in bankruptcy and accord-

ingly they may hire professionals, with court approval, pursuant to § 327. *See* 11 U.S.C. § 1107. Thus, a debtor in possession is a statutory fiduciary of its own estate. 11 U.S.C.A. §§ 1106, 1107(a). A trustee representing an estate in bankruptcy must receive independent counsel, regardless of the estate's relationship to other entities prior to filing. *In re Amdura Corp.*, 121 B.R. 862, 868–69 (Bankr.D.Colo.1990). The inability to fulfill the role of independent professional on behalf of the fiduciary of the estate constitutes an impermissible conflict. *See In re Adam Furniture Indus., Inc.*, 158 B.R. 291, 302 (Bankr.S.D.Ga.1993); *In re Prudent Holding Corp.*, 153 B.R. 629, 631 (Bankr. E.D.N.Y.1993) (§ 327(a) is prophylactic "to insure that the undivided loyalty and exclusive allegiance required of a fiduciary to an estate in bankruptcy is not compromised"). *Interwest*, 23 F.3d at 316 n. 9. *accord; In re Sky Valley, Inc.*, 135 B.R. 925, 939 (Bankr. N.D.Ga.1992) (Because counsel for debtor in possession has fiduciary duty, counsel may be placed in the "unusual position of sometimes owing a higher duty to the estate and the bankruptcy court than to his client.").

■ When counsel for a debtor in possession undertakes representation of a principal of the debtor, he or she has "abandoned his fiduciary obligations as counsel for the Debtor corporation" and it is a proper exercise of the bankruptcy court's authority under § 328(c) to deny all fees. *Fellheimer, Eichen & Braverman, P.C., v. Charter Technologies, Inc.*, 57 F.3d 1215, 1229 (3rd Cir.1995).

The duty of counsel to fully disclose possible conflicts and fee arrangements is thoroughly explained in the Bankruptcy Code and Rules and the many cases denying fees for the failure to comply with these duties. *See* 11 U.S.C. sect. 327 and 329; Fed. R.Bank.P. 2016 and 2014; *Interwest*, 23 F.3d 311; *In re Guard Force Management, Inc.*, 27 B.C.D. 883, 887–88, 185 B.R. 656, 662–63 (Bankr.D.Mass.,1995); *Rome v. Braunstein*, 19 F.3d 54 (1st Cir.1994); *In re Park–Helena Corp.*, 63 F.3d 877 (9th Cir.1995).

Long before the enactment of the current Bankruptcy Code and Rules, which impose upon counsel strict disclosure requirements and fiduciary obligations and impose upon

the bankruptcy judges independent duties of oversight, the Supreme Court of the United States noted that the "only way to assure that professionals maintain the requisite standards of fiduciary conduct is to strictly enforce compliance with the conflict of interest rules by denial of compensation." *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 269, 61 S.Ct. 493, 497–98, 85 L.Ed. 820, *reh'g denied*, 312 U.S. 715, 61 S.Ct. 736, 85 L.Ed. 1145 (1941).

■ It is for this reason that a bankruptcy attorney who fails in this fiduciary capacity, who fails to remain free of conflicts, who fails to refrain from serving conflicting interest during a case may, nay must, be denied all compensation.

## DISCUSSION AND CONCLUSIONS

■ Although movants contend that it erred in its findings, this Court is very satisfied that the evidence presented by all sides fully supports its conclusions.

As a preliminary matter, movants contend that this Court erred in denying all compensation because David E. Leta's services were reasonable and necessary within the meaning of 11 U.S.C.A. § 330(a)(1). Thus, movants contend that even if conflicts or improper actions were determined to have occurred, the appropriate sanction would merely be reduction in fees because the services were beneficial to the estate. In support of this position, movants cite *In re Kendavis Industries International, Inc.*, 91 B.R. 742 (Bankr. N.D.Tex.1988).

The record does not support movant's position that David E. Leta rendered a year's worth of valuable services to this estate. During the time this case was being handled by him, money was hemorrhaging out and valuable time was wasted. No effort was made to determine the accurate financial picture of the debtor, no effort was made to ascertain the true value of all assets, no effort was made to investigate the right of the estate to recover damages from professionals and insiders who, by their actual fraud or disregard of truth and honesty,

caused Bonneville to lose hundreds of millions of dollars.[24]

Further, in light of David E. Leta's testimony that he chose to undertake no investigation to determine what had actually happened to bring Bonneville to this pass, that he viewed his role as merely passing out forms or concentrating on ... "present tense, preserving the assets, avoiding loss of value, avoiding liabilities, not dwelling on historical events which were static and fixed in time and weren't going to change. We were dealing with events that were very dynamic and very fluid and were changing all the time ...", it would be impossible for any court to conclude that the services were valuable. How can a responsible debtor's attorney ignore the past in finding the true value of assets, in discovering if the estate has claims against insiders or claims for preferential transfers? How can a responsible debtor's attorney even begin to put together a plan and disclosure statement that meets statutory requirements when there is blanket refusal to perform any investigation? The explanation, of the worthlessness of "historical events," was used to justify David E. Leta's lack of inquiry regarding the downsized worth shown in the Buccino Report, pursue any query to ascertain the truth of the allegations contained in the Portland General Complaint, even read or ask questions concerning the Harris Report.

The Harris Report[25] is a series of charts showing various transactions with Bonneville and its insider-owned entities. The insiders are Hixson, Johnson, Wood, Peterson and Dunlop. There are Sallah International Cash Accounts in the name of Dunlop, Corradini, Hixson, Johnson, Wood. On the day it was completed it was initially presented to the examiner and Ralph R. Mabey. A meeting to which David E. Leta was not invited. He was given the report on May 8, 1992.

The Harris Report joined comfortably with the Buccino Report and the Portland General Complaint in laying out an insidious pattern of serious, fraudulent conduct on the part of insiders of the debtor. Testimony is given which proves all three were almost completely ignored by David E. Leta. He continued to be unconcerned about "historical events". For example, towards the end of January 1992, the subject of amending the schedules in light of the Buccino Report had not been discussed with anyone. It never occurred to him to amend the schedules to reflect the Buccino values. David E. Leta testified that the Report was not an appraisal, it was an education tool and a planning tool and didn't compel an amendment to the schedules.

No one is more aware than this Court that being counsel for a debtor in possession and trying to shepherd a Chapter 11 case through the bankruptcy system is a tough, demanding, time-consuming job. As a result, this Court is generous in its views of hourly rates and supportive of those who labor accordingly. *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557 (Bankr.D.Utah 1985). However, when counsel is charging $173 an hour, a debtor in possession is entitled to more than just "handing out forms."

This Court has always followed the spirit as well as the letter of the Bankruptcy Code and Rules and has always required professionals, employed on behalf of the estates in their charge, to conform to the highest ethical standards. *In re Green Street*, 132 B.R. 460 (Bankr.D.Utah, 1991). These are standards imposed not only by the Code and Rules, but are also a minimum requirement for the privilege to practice law in the State of Utah. *See* Professional Rules of Responsibility.

██ It would make a mockery of the Code and Rules, the Professional Code of Responsibility and would fatally undermine the public's already shaky confidence in the Chapter 11 process to adopt a position that lawyers abandoning their fiduciary duty to the estate may nonetheless recover huge hourly fees. This Court draws a bright line—professionals who violate their fundamental ethical obligations to the estates in their charge do not provide "valuable ser-

---

24. To date, according to documents in the Court files, the Trustee has recovered $141,637,883.78, the majority from professionals such as accountants and attorneys as well as insiders.

25. The Harris Report is Exhibit 23 and is dated April 10, 1992.

vices" to those same estates. To give just one small example, if the plan, proposed by David E. Leta had proceeded to confirmation there is every likelihood that the misdeeds of the insiders would have been covered over forever and the millions, which have since been recovered by the trustee, would have been gone with the wind.

Movants contend that this Court's findings were erroneous and do not support the denial of fees and the disgorgement of previously awarded fees. Somewhat inaccurately, they characterize the prior findings as follows:

1. The plan and disclosure statement were "wholly inappropriate" and contained information inconsistent with the Examiner's Report and with the Statement of Affairs and the Monthly Financial Reports.

2. Debtor's counsel engaged in unnecessary litigation and in "tactics that lead to excesses [and] delay of the case."

3. Debtor's counsel represented the interests of Bonneville's principals to the detriment of the estate.

More accurately, this Court's actual findings were that:

A. David E. Leta, while counsel for the debtor in possession, represented the interests of the principals of the debtor to the detriment of the estate.

B. David E. Leta engaged in activities designed to "sabotage efforts to ascertain the truth concerning the financial picture of this debtor." The activities included (1) filing and (2) noticing for hearing a plan and disclosure statement that were (3) wholly inappropriate and (4) misleading.

The Court addresses its prior findings as follows:

### Representation of the Interests of the Principals to the Detriment of the Estate and Engaging in Activities Designed to Sabotage Efforts to Ascertain the Debtor's True Financial Picture

1. Failure to outline, in the disclosure statement, the potential liability to the estate of the insiders of Bonneville for fraudulent transfers, self-dealing, embezzlement and stock fraud. With the settlements produced by the trustee to date, the value to the estate of such actions against the Bonneville insiders totals more than $6,000,000.00.

2. The filing of a plan of reorganization that provided that claims be brought only by the reorganized debtor under the control of an advisory committee controlled by creditor designees. However, a condition precedent to the effectiveness of the plan was the entry of a final order equitably subordinating all claims of Portland General. In essence, this plan would have preserved the Bonneville insiders' control over litigation until the Portland General litigation is finally resolved— potentially, years later. At present, the Portland General litigation has not been resolved, and, during this time period, the trustee has recovered more than $1.5 million from the very individuals who would have controlled the litigation under the terms of the proposed plan.

3. Attempting to utilize the protection of the bankruptcy court for the personal benefit of Bonneville insiders by seeking a § 105 injunction to enjoin legal actions against such insiders who had little or no involvement with the debtor at the time of the hearing.

4. Filing an amended schedule of assets on April 10, 1992, indicating that the value of Bonneville assets totals $256,887,291.41. The amended schedules overstate the value of Bonneville assets by more than $200 million when compared to the valuation of Bonneville assets reported by Buccino & Associates on January 28, 1992.

5. Drafting and arguing a motion for authority to compromise disputed claims of Magic Valley Limited Partners. Here, David E. Leta failed to disclose two important facts to the court: (1) Some partners of Mayer, Brown & Platt were limited partners of the Magic Valley Partnership. David E. Leta knew prior to the hearing of February 27, 1992, that some Mayer, Brown & Platt partners were financially involved with Magic Valley and that some held limited partnership interests in the project; (2) David E. Leta agreed to and did prepare an opinion letter for the Mayer, Brown & Platt partners who held limited partnership interests in the Magic Valley project. For this work, David

E. Leta was paid by his client Mayer, Brown & Platt.

## CONCLUSION

Movants have failed to meet their burden of showing that this Court's previous findings were incorrect. Instead, the record fully supports the findings. In the prior decision, this Court attempted to avoid specifics that would embarrass David E. Leta anymore than necessary to explain its findings and conclusions. It is indeed a sad day, for any court, when its duties imposed by the Bankruptcy Code and Rules require that it find dereliction of fiduciary duty that mandate denial of fees and disgorgement of previously allowed fees. Notwithstanding the unpleasantness of its duty, this Court cannot, and will not, shirk its own obligations to supervise the professionals entrusted with bankruptcy estates.

Accordingly, Hansen, Jones & Leta and Snell & Wilmer's Motion to Alter or Amend the December 2, 1992, Memorandum Opinion and Decision is DENIED.